Maria S. Bellafronto (State Bar No. 161994)
Monique D. Jewett-Brewster (State Bar No. 217792)
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 S First Street
San Jose, CA  95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:    (408) 286-9800
Facsimile:    (408) 998-4790

Philip S. Rosenzweig, Esq. (PA Bar No. 62461)
SILVERANG, DONOHOE, ROSENZWEIG &
HALTZMAN, LLC
595 East Lancaster Avenue, Suite 203
St. Davids, PA  19087
Telephone:    (610) 263-0115
Facsimile:    (610) 263-0122

Attorneys for Plaintiff
GULAMNABI VAHORA, M.D., Ph.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| GULAMNABI VAHORA, M.D., Ph.D., | CASE NO.  16-888 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) BREACH OF ORAL CONTRACT;** |
| VALLEY DIAGNOSTICS LABORATORY INC., NAEEM MUJTABA QARNI (a/k/a QARNI NAEEM UL MUJTABA), NAJAM UL MUJTABA QARNI and SHEIKH M. MASOOD, M.D., | **(2) BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING;** |
| | **(3) UNJUST ENRICHMENT;** |
| | **(4) PROMISSORY ESTOPPEL;** |
| Defendants. | **(5) BREACH OF CALIFORNIA'S UNFAIR COMPETITION LAW;** |
| | **(6) CIVIL CONSPIRACY TO COMMIT FRAUDULENT DECEIT;** |
| | **(7) INTENTIONAL MISREPRESENTATION;** |
| | **(8) CONVERSION;** |
| | **(9) DECLARATORY RELIEF** |
| | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Gulamnabi Vahora, M.D., Ph.D. ("Dr. Vahora") brings this action against Valley Diagnostics Laboratory Inc., Naeem Mujtaba Qarni, a/k/a Qarni Naeem Ul Mujtaba, Najam Ul Mujtaba Qarni, and Sheikh M. Masood, M.D. (collectively, "Defendants") for breach of oral contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, promissory estoppel, violation of California's Unfair Competition Law, civil conspiracy to commit fraudulent deceit, intentional misrepresentation, conversion, and declaratory relief.

**THE PARTIES**

1.      Plaintiff Dr. Vahora is an adult individual and citizen of the Commonwealth of Pennsylvania with a residential address of 820 Timber Creek Lane, Wayne, Delaware County, Pennsylvania.

2.      Defendant Valley Diagnostics Laboratory Inc. ("VDL") is a California corporation formed on July 18, 2001 and assigned entity number C2247152.  See California Entity Detail (a true and correct copy of which is attached hereto as **Exhibit 1**).  VDL's listed address is 300 East Almond Avenue #104, Madera, California 93637, which is, upon information and belief, VDL's principal place of business.  *Id.*

3.      Upon information and belief, VDL also operates its business from a second office located at 373 East Warner Avenue, Suite 102, Fresno, California 93710.

4.      Defendant Naeem Mujtaba Qarni, a/k/a Quarni Naeem Ul Mujtaba ("Naeem"), is an adult individual and resident of the State of California.

5.      Upon information and belief, Naeem resides at 745 N. Fowler Avenue, Clovis, California 93611.

6.      Naeem is the agent for service of process for VDL, with a listed address of 300 East Almond Avenue #104, Madera, California 93637.

7.      Upon information and belief, Naeem is the President and part-owner of Defendant VDL.

8.      Defendant Najam Ul Mujtaba Qarni ("Najam") is an adult individual and upon information and belief, Canadian resident.

9.      Upon information and belief, Najam resides at 2661 Lindholm Crescent, Mississauga, Ontario L5M 4P5, Canada.

10.     Defendant Sheikh M. Masood, M.D. ("Dr. Masood") is an adult individual and resident of the State of California.

11.     Upon information and belief, Dr. Masood's business address for service of process is 508 East Almond Avenue, Madera, California 93637.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between parties that are deemed citizens of different states.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendants reside in this District for purposes of venue, and a substantial portion of the events and omissions giving rise to this action occurred in this District.

14.     The registered office for Defendant VDL is in Madera, Madera County, California, which is within this District.  *See* Ex. 1.

15.     Defendant Naeem's address as registered agent for VDL is in Madera County, California, which is within this District.  *Id.*

16.     Both VDL and Naeem maintain the same principal place of business in Madera, Madera County, California, which is within this District.  *Id.*

17.     Defendant Naeem's residence is in Clovis, Fresno County, California, which is within this District.

18.     Defendant Dr. Masood works and resides in Madera, Madera County, California, which is within this District.

19.     The wrongful and fraudulent acts complained of below were organized, orchestrated and executed from Madera, Madera County, California, which is within this District.

20.     Therefore, venue and jurisdiction in this Court is proper.

**BACKGROUND**

21.     Plaintiff Dr. Vahora has owned and operated numerous successful businesses

engaged in medical diagnostic testing, clinical trial research, and pathology, and is experienced in health care disciplines ranging from biochemistry to microbiology.  In his nearly five decades of experience in medicine and laboratory matters, Dr. Vahora has also served as the assistant pathology director at the Philadelphia College of Osteopathic Medicine Hospital, and the chairman of the prestigious Joint Commission on Accreditation of Hospitals.  Dr. Vahora has a medical degree as well as a Ph.D. in microbiology and biochemistry, and operates medical charities in the United States and India, including the Vahora Institute.

22.     In March 2012, Plaintiff Dr. Vahora was contacted by a former employee, Defendant Najam.

23.     Dr. Vahora employed Najam fifteen years prior in a medical diagnostic testing facility for a period of two years, and the two men kept in touch after the employment relationship ended.

24.     Defendants Najam and Naeem are brothers.

25.     Najam informed Dr. Vahora in March 2012 that his brother Naeem was living in Pakistan, working for a bank, and planning to move to the United States as part of the E-2 Treaty Investor visa program.

26.     Upon information and belief, in order to obtain a visa under the E-2 Treaty Investor program, pursuant to 22 C.F.R. 41.51(b), Naeem was required to invest a substantial amount of capital in the purchase and ownership of a United States business.

27.     Defendant Dr. Masood is a practicing nephrologist in Madera, California.

28.     Defendants Dr. Masood and Naeem are related through marriage – Dr. Masood's son is married to Naeem's daughter.

29.     In order to facilitate Naeem's E-2 visa, Dr. Masood and Najam hatched a plan: Naeem would purchase an existing American business, preferably a medical business, because that is the field of Dr. Masood's expertise.

30.     Najam and Dr. Masood sought assistance from Dr. Vahora in the analysis and purchase of an existing medical business in order to support Naeem's visa application.

31.     Dr. Masood identified VDL, an existing business engaged in medical diagnostic

testing which Dr. Masood knew to be for sale.

32.     VDL is located one-half block down on the same street as Dr. Masood's medical office in Madera, California, and upon information and belief Dr. Masood has long been acquainted with VDL's then owner, non-party Dr. Muhammad Saeed ("Dr. Saeed").

33.     Dr. Saeed sought a sale price of $400,000 for VDL.

34.     Dr. Masood, Najam and Naeem consulted with Plaintiff Dr. Vahora with respect to the proposed purchase of VDL, because of Dr. Vahora's extensive experience in the operation and valuation of such medical laboratory businesses.

35.     Accordingly, Dr. Vahora engaged in a systematic analysis of VDL's value, and modeled the number of laboratory samples required to achieve profitability for VDL.

36.     In addition, at his own expense, Dr. Vahora visited the Madera, California location of VDL several times, where he met with Dr. Saeed and Dr. Masood.

37.     Najam suggested multiple times throughout the valuation process that Dr. Vahora form a partnership with Naeem to invest in VDL.

38.     Dr. Masood also encouraged Dr. Vahora to become a partner with Naeem in the ownership and operation of VDL while Dr. Vahora was evaluating VDL.

39.     On March 29, 2012, to assist in the analysis of VDL's value, Dr. Masood e-mailed Dr. Vahora copious information about VDL that he obtained from Dr. Saeed (a true and correct copy of Dr. Masood's March 29, 2012 e-mail and the appended information is attached hereto as **Exhibit 2**).

40.     The information about VDL sent by Dr. Masood includes a list of VDL equipment; previous 60-day financials; average daily requisitions; average daily billable amount per requisition; VDL's capabilities for medical panels, medical tests, microbiological assessments and cytology screenings; and the list of currently accepted medical insurance.  *See* Ex. 2.

41.     Upon completion of his analysis of the information about VDL provided by Dr. Masood, Dr. Vahora determined that VDL was worth no more than $200,000.

42.     Najam and Dr. Masood both increased their campaign to convince Dr. Vahora to invest in VDL in partnership with Naeem.

43.     Najam represented to Dr. Vahora that Naeem would serve as a competent lab manager and a worthy partner in ownership of the lab.

44.     Dr. Masood represented to Dr. Vahora that partnering with Naeem to purchase the laboratory was an excellent investment and would prove enriching to Dr. Vahora, (not personally and financially draining).

45.     Defendant Naeem worked in the finance industry for Bank Al Falah in his native Pakistan, and had no relevant experience operating a medical diagnostic laboratory.

46.     After Dr. Vahora completed his analysis of VDL, Naeem formally asked Dr. Vahora to be his partner in VDL, in light of Dr. Vahora's extensive expertise in microbiology, biochemistry and pathology, as well as his past business experience operating multiple successful medical diagnostic laboratories.

47.     The negotiation of terms for the purchase of VDL occurred between Dr. Masood (on behalf of Naeem) and Dr. Vahora.

48.     The terms of the agreement were as follows:

- Dr. Vahora and Naeem would jointly purchase VDL for $200,000;
- Dr. Vahora and Naeem would each contribute $100,000 to the purchase of VDL;
- Dr. Vahora and Naeem would be equal partners in VDL, with the potential of Dr. Saeed and Dr. Masood having small ownership interests therein by subsequent mutual agreement;
- Naeem would apply for legal immigrant status in the United States pursuant to the E-2 Treaty Investor program;
- Dr. Vahora would teach Naeem how to operate and manage VDL; and
- Naeem would run the day-to-day operations of VDL and have the title of President of VDL.

49.     On April 17, 2012, on the basis of this agreement reached by Dr. Vahora and Dr. Masood (on behalf of Naeem), Naeem e-mailed Dr. Vahora to evidence the terms of the partnership achieved (a true and correct copy of which e-mail is attached hereto as **Exhibit 3**).

50. Therein, Naeem wrote in significant part:

Dear Dr.Vohra [sic] Sahab,[1]

First of all im [sic] really grateful and obliged from the bottom of my heart, that you have very generously and kindly accepted my request of partnership.  Without your support and kindness I could not have taken this big decision of my life.  For our convenience i [sic] would like  to recap our discussion which is as under [sic]:

a) You have kindly accepted a 50% partnership with me.

b) After the basic investments of partnership different types of improvement of the lab will be required which will iniitally [sic] be taken care of by you and i [sic] will pay it off over a period of time.

c) As we know that this is a big favor for me and since you will not be able to be physically present all the time and therefore i [sic] will be fully involved and responsible all the time to follow your guidelines with full dedication and hard work and Insha allah i [sic] assure you  that you will not be disappointed by me in any aspect.

d) We have mutually agreed that this business will not carry anything which directly or indirectly involves interest.

addition to the above following are the points that you discussed with Dr Masood [sic]:

a) Dr saeed [sic] will have some shareholding in the lab and we will have to give some salary to him at the end of the year.

b) I was also informed by Dr. Masood that we will be offering some share to other doctors also. On the basis of these new informations i think we have to redistribute the share among ourselves.

c) It also came into your discussion that since I will be insha allah full time working in the business I will also be given some salary, the amount of which will be decided later.

d) On a concluding note I would like to inform you that i am proceeding for the sale of my house so i will appreciate if you can expedite in the finalization of the deal with Dr. Saeed.

If there are any questions or concerns regarding the above mentioned matter, please contact me as soon as possible.

In the end I once again thank you and will always remember you in my prayers.

Please Acknowledge.

---

[1] "Sahab" is an honorific used in Northern Indian languages to denote "Sir."

Ex. 3.

51.     Upon information and belief, at the suggestion of Najam and Dr. Masood, Naeem subsequently retained Immigration Lawyers of America, P.C., a California immigration law firm, to handle both Naeem's visa application and the purchase of VDL by Naeem and Dr. Vahora.

52.     Accordingly, on June 27, 2012, Naeem transmitted to Dr. Vahora via e-mail an unexecuted copy of the Agreement of Sale for VDL drafted by Naeem's immigration attorney (a true and correct copy of which is attached hereto as **Exhibit 4**).

53.     Therein, the seller was listed as Dr. Saeed, the purchaser was listed as Naeem and the sale price was listed as $200,000.  Ex. 4.

54.     Although Dr. Vahora was not listed in the draft Agreement of Sale as a purchaser of VDL at the election of Naeem's counsel, he nevertheless validly contracted with Naeem at the insistence of Najam and Dr. Masood – both by oral agreement and via written e-mail – to form an equal partnership for the purchase, ownership and management of VDL.

55.     Thereafter, in July 2012, in comportment with the terms of the agreement memorialized in writing by Naeem in the April 17, 2012 e-mail, Dr. Vahora and Defendant Naeem purchased VDL for $200,000.

56.     Under the initial agreement, Naeem and Dr. Vahora were to each contribute $100,000 toward the purchase of VDL, and each was to own a 50 percent interest in VDL.

57.     Upon information and belief, Naeem's $100,000 share was obtained from the sale of his house in Pakistan.

58.     However, prior to the purchase of VDL, Naeem unexpectedly determined that he would require $20,000 toward a down-payment on the purchase of a home, thereby reducing his contribution to the VDL purchase to $80,000.

59.     Therefore, in contravention of the original agreement, Naeem only invested $80,000 in the purchase of VDL, and Dr. Vahora in fact invested $120,000 toward the purchase of VDL.

60.     As a result, the initially contemplated 50/50 partnership in VDL by and between Dr. Vahora and Naeem became a de facto 60/40 partnership, with Dr. Vahora owning a 60

percent interest in VDL and Naeem owning a 40 percent interest in VDL.

61.     Although the VDL purchase was executed in July 2012, and Naeem's job involved day-to-day management of the laboratory facilities in Fresno and Madera, Naeem was still employed by Bank Al Falah in Pakistan through August 26, 2012.  *See* September 4, 2012 e-mail from Naeem (a true and correct copy of which is attached hereto as **Exhibit 5**) ("I have consumed all my leaves paid and unpaid and finally i [sic] also submitted my resignation to the bank on the 26th of august [sic].  The children are not enrolled into [California] schools even though the schools have started two weeks ago.  You can imagine that our situation is quite stressful for us. We are very anxious.").

62.     Upon information and belief, Naeem's initial immigration petition was not immediately approved, but rather was answered with a Request for Evidence, requiring Naeem to demonstrate that he met the criteria for an E-2 Treaty Investor.  *See* September 19, 2012 e-mail from Naeem (a true and correct copy of which is attached hereto as **Exhibit 6**).

63.     In early September 2012, Naeem asked Dr. Vahora to submit a formal evaluation of VDL to U.S. Citizenship and Immigration Services ("USCIS"), as part of Naeem's response to the Request for Evidence.

64.     On September 7, 2012, Dr. Vahora e-mailed Naeem a draft evaluation of VDL (a true and correct copy of which is attached hereto as **Exhibit 7**).

65.     On September 10, 2012, Owais Qazi, Esquire ("Qazi") of Immigration Lawyers of America, P.C., counsel for Naeem, e-mailed Dr. Vahora an edited version of his VDL evaluation for Dr. Vahora's signature (a true and correct copy of which is attached hereto as **Exhibit 8**).

66.     Naeem's response to USCIS's Request for Evidence was submitted on September 18, 2012.  *See* Ex. 6.

67.     On September 28, 2012, USCIS issued a Notice of Decision denying Naeem's immigration petition with respect to Naeem, his spouse, and their four children (a true and correct copy of which is attached hereto as **Exhibit 9**).

68.     Therein, USCIS noted that Naeem's immigration "petition indicates that he is the sole owner of the investment enterprise with a total investment fund of $200,000" and that

"Valley Diagnostics Lab, Inc. transferred 100% of the corporate shares to the applicant on July 19, 2012, pursuant to the sale of the business." Ex. 9 pp. 2 & 3. Because Naeem did not supply USCIS with VDL's up-to-date Statement of Information, VDL's bill of sale, VDL's current business license, letters from VDL's current bank (in Naeem's name) or VDL's current lease (in Naeem's name), USCIS found that

> it is unclear how the applicant has the control interest to the investment enterprise. It appears that the applicant, who allegedly purchased the investment enterprise and is the 100% owner of the company retains no rights and responsibilities in developing and directing the investment enterprise.

Ex. 9 p. 5.[2]

69.   Upon information and belief, Defendant Naeem falsely represented to United States immigration authorities on his residency application that he *alone* purchased, owned, managed and operated VDL, and/or that he invested $200,000 in the purchase of VDL. *See* Ex. 9 pp. 2, 3 & 5.

70.   Also upon information and belief, subsequent to the purchase of VDL, Naeem diluted his 40 percent ownership in VDL by selling and/or sharing a portion of his interest in VDL with Dr. Saeed and/or Dr. Mahmood and/or Najam and/or third parties without the consent of Dr. Vahora.

71.   Subsequent to the September 28, 2012 denial of Naeem's immigration petition, his attorney Qazi commenced an informal appeal thereof.

72.   As the majority owner of VDL, Dr. Vahora had no choice but to adhere to the partnership agreement he and Naeem reached in April 2012. Accordingly, in or about October 2012, Dr. Vahora began to teach Naeem how to operate a medical diagnostic laboratory while Naeem's immigration appeal dragged on.

73.   Throughout 2012 and 2013, Dr. Vahora travelled frequently from his home in Pennsylvania to VDL's facilities in California, provided large amounts of supplies to VDL, and

---

[2] As an independent basis for denying Naeem's petition, USCIS determined that "[t]he evidence is insufficient to establish that the investment funds or assets were not obtained through criminal activity." Ex. 9 p. 3.

infused VDL with enormous amount of operating capital because it could not pay its expenses – which costs Dr. Vahora at times funded on his personal credit cards.

74.     Furthermore, while Naeem focused on his immigration status, and even long after Naeem's immigration petition was settled, Dr. Saeed acted as a technical consultant for VDL on a day-to-day basis, although he no longer had an ownership interest in VDL.

75.     Dr. Vahora was left responsible for compensating Dr. Saeed, as Naeem was unable to run the laboratory on a daily basis as he had promised, and Naeem represented to Dr. Vahora that he was without sufficient assets to contribute to VDL's operating and overhead expenses.

76.     Dr. Vahora received no salary or compensation, no reimbursement for expenses related to his frequent travel between Pennsylvania and California, and no recompense for the supplies and operating capital he infused into VDL in order to keep it open while it made no income.

77.     At the same time, Naeem, who contributed little or nothing to the operations and profitability of VDL, demanded a salary and a loan from Dr. Vahora.

78.     Not wanting to risk his enormous investment into the acquisition and operation of VDL, Dr. Vahora reached an agreement with Naeem by telephone to increase Naeem's productivity and supply him with a loan and salary.

79.     In October 2012, Dr. Vahora received an e-mail from Naeem documenting their telephonic agreement, including the following provisions:

- Naeem would take responsibility for ordering VDL marketing supplies from Pakistan, so that Dr. Vahora no longer was compelled to provide them;

- VDL would hire a new laboratory technician, whom Dr. Saeed would supervise;

- VDL would offer and advertise and increased array of services, including in-home and nursing home blood draws;

- Naeem's loan from VDL would be "paid off through my profit income over a period of time;" and

- Naeem's monthly salary would initially be $3,000, with a raise to $5,000 based on his attainment of certain criteria.

*See* Naeem's October 30, 2012 e-mail (a true and correct copy of which is attached hereto as **Exhibit 10**).

80.     However, even after several months on the job and with Dr. Saeed and the existing staff on the premises, Naeem exhibited great difficulty running VDL.  Naeem depended upon Dr. Vahora's instruction and guidance on all matters, even the most minute.

81.     For example, on December 6, 2012, Naeem sought Dr. Vahora's approval of flyers created by an outside graphic design firm.  *See* December 6, 2012 e-mail and attached flyers (true and correct copies of which are attached hereto as **Exhibit 11**).

82.     As another example, on December 18, 2012, Naeem sought Dr. Vahora's "input and necessary guidance" with respect to the renewal of VDL's commercial lease.  *See* December 18, 2012 e-mail and attached lease (true and correct copies of which are attached hereto as **Exhibit 12**).

83.     It was becoming evident to Dr. Vahora that Naeem's value to VDL was significantly lower than Najam and Dr. Masood had represented to Dr. Vahora prior to his entering into a partnership with Naeem.

84.     Naeem's mismanagement of VDL was evidenced by the fact that, after five months under his day-to-day charge, the lab was processing only twenty specimens per day.

85.     Naeem was unable to grow the business without Dr. Vahora's constant attention, opinions, decision-making and assurances.

86.     Furthermore, Naeem depended entirely upon Dr. Vahora's continual infusion of funds beyond the initial $120,000 investment in order to keep VDL afloat and fund Naeem's salary and loan.

87.     In spite of the fact that he had not achieved the goals set forth in the October 30, 2012 e-mail agreement, Naeem improperly raised his own monthly salary from $3,000 to $5,000.

88.     VDL simply could not afford to pay Naeem the sum of $5,000 per month, in light of its unprofitable status.

89.   Furthermore, upon opinion and belief, Naeem used VDL funds – which Dr. Vahora ultimately supplied – for his own personal expenses.

90.   In fact, by the end of 2012, under Naeem's day-to-day operational control, VDL was in a state of managerial disarray and fiscal crisis.

91.   This was due in large part to Naeem's mismanagement of the lab and misuse of VDL's funds for personal expenses.

92.   Therefore, in December 2012, Dr. Vahora had no choice but to step into a more proactive role in VDL's daily management in an effort to make VDL profitable.

93.   Naeem's role thereafter was to maintain VDL's finances and to execute Dr. Vahora's instructions.

94.   First, Dr. Vahora facilitated VDL's hire of non-party Alfonso Flores ("Flores"), a longtime employee of Dr. Vahora in his other medical laboratory businesses, as its full-time Vice President of Sales.

95.   Flores immediately engaged in tasks that Naeem neglected, such as producing comparisons of competitors' testing fees. *See* Flores' December 20, 2012 e-mail and attached chart (a true and correct copy of which are attached hereto as **Exhibit 13**).

96.   Dr. Vahora conducted research about and personally invested in the modernization and replacement of VDL's medical testing equipment. *See* January 11, 2013 correspondence and attached contract by and between VDL and CompuGroup regarding sale by LabDAQ of Siemens Advia 1650 and Centaur CP instrument interfaces (a true and correct copy of which are attached hereto as **Exhibit 14**).[3]

97.   Because VDL had insufficient operating capital, Dr. Vahora personally paid VDL's rent.

98.   Dr. Vahora also personally paid many of VDL's operating expenses, including the purchase of supplies necessary to carry out VDL's medical testing and diagnostic business.

---

[3] Although VDL's contracting representative is listed as Dr. Saeed, it was actually Dr. Vahora who engaged in the contract negotiations, as evidenced by the fact that all e-mail communications from CompuGroup's account manager were sent directly to Dr. Vahora, not to Dr. Saeed.

99.     Dr. Vahora also singlehandedly funded VDL's operating shortfalls.

100.    Naeem acknowledged Dr. Vahora's role in funding VDL.  For example, in a January 12, 2013 e-mail to Dr. Vahora (a true and correct copy of which is attached hereto as **Exhibit 15**), Naeem memorialized that Dr. Vahora "sent the last check of [$]30,000 dated 19[th] of Nov."  Ex. 15 p. 2.

101.    In total, Dr. Vahora spent in excess of $380,000 on VDL's operating expenses, payroll, rent and other daily expenses.

102.    The additional funds originating from Dr. Vahora were in addition to his original $120,000 purchase of a 60 percent ownership interest in VDL.  Therefore, Dr. Vahora's total investment in VDL exceeded $500,000.

103.    When Dr. Vahora and Flores began directly managing VDL, its productivity increased immediately and dramatically.

104.    By Naeem's admission, in the first eight days of January 2013, VDL made 290 requisitions, as compared with 20 requisitions per month when the lab was under Naeem's sole daily control.  Ex. 15 p. 1.

105.    Dr. Vahora and Flores worked hard throughout 2013 to ensure that VDL ran effectively and efficiently.

106.    For example, even while recovering from surgery, Dr. Vahora researched and contracted for the installation and maintenance of new laboratory equipment for both of VDL's sites, which resulted in substantial savings for VDL.  *See, e.g.*, January 15-18, 2013 correspondence between Dr. Vahora and Diamond Diagnostics Inc. (a true and correct copy of which is attached hereto as **Exhibit 16**); January 13-29, 2013 correspondence between Dr. Vahora and CompuGroup (a true and correct copy of which is attached hereto as **Exhibit 17**).

107.    After the purchase of such new equipment was complete, Dr. Vahora managed the maintenance and warranties on the machinery.  *See* February 11, 2013 e-mail correspondence between Dr. Vahora and Siemens' account manager (a true and correct copy of which is attached hereto as **Exhibit 18**).

108.    On his own initiative, Flores began regularly visiting nursing homes on behalf of

VDL to advertise VDL's dedicated nursing home blood draw service. *See, e.g.*, December 14, 2012-February 8, 2013 e-mails between Flores and Rehab Centre of Fresno (true and correct copies of which are attached hereto as **Exhibit 19**).

109. Flores also created custom lab order templates for physicians who regularly patronized VDL. *See* April 10, 2013 e-mail from Flores transmitting attached templates (a true and correct copy of which is attached hereto as **Exhibit 20**).

110. Together, Flores and Dr. Vahora researched, comparatively priced and then bulk purchased reagents required for VDL to carry out its medical laboratory testing. *See* April 21, 2013 e-mail between Flores and Thermo Fisher Scientific Specialty Diagnostic Group (a true and correct copy of which is attached hereto as **Exhibit 21**); April 23, 2013 e-mails and attached product offering between Dr. Vahora and Diazyme Laboratories (a true and correct copy of which is attached hereto as **Exhibit 22**); July 8, 2013 e-mail from Imunalysis Corporation to Dr. Vahora, a true and correct copy of which is attached hereto as **Exhibit 23**).

111. Flores also worked with an outside software company to create a computerized VDL requisition form. *See* April 22-26, 2013 e-mail correspondence between Flores and Software Inventors Ltd. (a true and correct copy of which is attached hereto as **Exhibit 24**).

112. Throughout this time, Naeem continued to regularly seek funds from Dr. Vahora, purportedly to support VDL's operations.

113. For example, on December 12, 2012, Naeem sought $19,692 from Dr. Vahora. *See* December 12, 2012 e-mail from Naeem to Dr. Vahora (a true and complete copy of which is attached hereto as **Exhibit 25**).

114. On December 14, 2012, Naeem sought $1,200 for payments to staff. *See* December 14, 2012 e-mail from Naeem to Dr. Vahora (a true and complete copy of which is attached hereto as **Exhibit 26**).

115. On January 22, 2013, Naeem informed Dr. Vahora in an email (a true and correct copy of which is attached hereto as **Exhibit 27**) that Naeem had "borrowed" $4,000 from Dr. Masood because "I did not get any response or check from you[.]"

116. On January 27, 2013, Naeem again e-mailed Dr. Vahora in search of additional

funds, this time explaining that VDL was operating at a $15,000 monthly deficit.  *See* January 27, 2013 e-mail from Naeem to Dr. Vahora (a true and complete copy of which is attached hereto as **Exhibit 28**).

117.    In that same January 27, 2013 e-mail, Naeem informed Dr. Vahora that VDL was responsible to Dr. Masood for the $4,000 which Naeem had "borrowed" from Dr. Masood.

118.    Three days later, on January 30, 2013, Naeem informed Dr. Vahora by e-mail that Naeem had once again miscalculated VDL's monthly expenses, describing his miscalculation as follows:

> when i thought about it again i realized that the gap between income and expenses is actually more than what i was calculating. One basic mistake i made was to consider the two weeks salary as the monthly salary (being used to the pakistani system) i.e mentioning 10000 instead of 20000 approx, including federal and state taxes but excluding alfonsos [sic] salary. . . . if we see our present scenario i am not seeing break even to happen with less than 60 samples per day, because the monthly average expenses are 40000.

*See* January 30, 2013 e-mail from Naeem to Dr. Vahora (a true and correct copy of which is attached hereto as **Exhibit 29**).

119.    With his confidence in Naeem's ability to manage VDL and VDL's finances now completely eroded, Dr. Vahora required Naeem to submit detailed expense reports for November 2012 through January 2013.  Naeem provided those reports via e-mail dated February 6, 2013 (a true and correct copy of which is attached hereto as **Exhibit 30**).

120.    At Dr. Vahora's direction, Naeem continued to submit frequent reports of VDL's expenses and income, replete with excuses for VDL's inexplicably low profits.

121.    For example, in February, certain of VDL's laboratory equipment and machinery malfunctioned on Naeem's watch, and was sent to the supplier, Siemens, for repair.

122.    Naeem explained to Dr. Vahora in a series of e-mails between March 7-29, 2013 (a true and correct copy of which is attached hereto as **Exhibit 31**) the situation as follows:

> March 7, 2013: "You were inquiring about the financial situation and showed your concern which is obviously a big concern. However, [I am] new to everything and not being involved in the process of due diligence Im [sic] unfortunately unable to understand the situation fully giving me a lot of stress and confusion, you must

> have already been aware of [my] incapability of not handling the tests, insurances and other issues from day 1. Also this increase is not effecting positively on the bottom line. On the part of the machines, you are aware that they have been in the warehouse for one month and still there is no headway and you know that if they are installed today it will take a further month to get them to work after getting all the necessary approvals. This might be another hindrance towards the bottom line increase."

Ex. 31 p. 3.

123.    On March 25, 2013, Naeem informed Dr. Vahora that he was unable to register VDL with the State of California in order to accept MediCal payments, that "our credit limit has burst" with the supplier of the reagents required to perform VDL's medical testing functions, and that even *more* of Dr. Vahora's funds were required for the payment of salaries and rent.  See Ex. 31 p. 2.

124.    Four days later, on March 29, 2013, Naeem e-mailed Dr. Vahora, claiming that although (under the direct control of Flores and Dr. Vahora) VDL's average daily sample number rose from 34 to 43, "unfortunately all this is not helping us on the base line."  Ex. 31 p. 1.

125.    Yet again, Naeem sought between $17,000 and $18,000 from Dr. Vahora on an emergency basis within the ensuing five days "after which we will be facing a default situation in paying the rents."  *Id.*

126.    Less than a month later, on April 28, 2013, Naeem sought still *more* money from Dr. Vahora, writing:

> first and foremost, the business requires 15-20K to settle the bills and other obligations. I will appreciate it if you can send it as early as possible by 5th of may [sic] through direct transfer, enabling us to pay timely. Because in the past few months we were lacking behind and everything is over due.

April 28, 2013 e-mail from Naeem to Dr. Vahora (a true and correct copy of which is attached hereto as **Exhibit 32**) at p. 1.

127.    In the same correspondence, Naeem reported to Dr. Vahora that replacement laboratory machinery would cost VDL $40,000.  *Id.*  Absurdly, Naeem recommended that VDL make the purchase because "i [sic] think in 13 days the cost of the machines will be recovered just from the profits."  *Id.*

128.    In an e-mail dated May 1, 2013 (a true and correct copy of which is attached hereto as **Exhibit 33**), Naeem reported to Dr. Vahora that, under the guidance of Flores and Dr. Vahora, VDL "closed last month averaging 42 specimen [sic] per day and this month we started with 50." Ex. 33.

129.    Naeem also reported that Dr. Saeed was attempting to "set up the machines," and that VDL had "still not received the final go ahead from medicare [sic] to submit our bills." *Id.*

130.    At the time, Dr. Vahora believed Naeem's claims that Dr. Vahora's capital injections were solely supporting VDL's operations, and not Naeem personally.

131.    By June, VDL's financial situation under Naeem's daily mismanagement was dire.

132.    On June 29, 2013, Naeem wrote an e-mail to Dr. Vahora (a true and correct copy of which is attached hereto as **Exhibit 34**) requesting an immediate infusion of $45,000.

133.    Also that month, Dr. Saeed, who was still working as a technical consultant to VDL, reported to Dr. Vahora on the problems that he witnessed at the lab, particularly with respect to the non-functional laboratory machinery and Naeem's inability to properly manage its repair or replacement.

134.    In an e-mail dated June 30, 2013 (a true and correct copy of which is attached hereto as **Exhibit 35**), Dr. Saeed wrote:

> I have been a clinical lab professional for many years and this includes extensive experience in bench-work and administration/management.  During this time, I have established 4 labs and been responsible for purchasing, installation, start-up, function of many pieces of complex and non-complex instruments. This entails a very detailed and organized approach. I have never experienced such bad planning and organization by management to execute this project.

Ex. 35 p. 1.

135.    Realizing that Naeem was not fit for his position, Dr. Vahora began seeking a new on-site laboratory director for VDL. *See* June 21, 2013-July 2, 2013 correspondence between Dr. Vahora and laboratory director candidate Kambiz Yaraei, a true and correct copy of which is attached hereto as **Exhibit 36**.

136.    Dr. Vahora continued to function as VDL's at-large manager and decision-maker

1   regarding laboratory, operations.

2         137.    Dr. Vahora's unilateral decision to seek a replacement day-to-day

3   director/operations manager for VDL apparently did not sit well with Naeem.

4         138.    On July 3, 2013, Naeem informed Flores, his perceived competition within VDL,

5   that Dr. Vahora was no longer involved with VDL.  July 8-12, 2013 e-mail correspondence

6   among Flores, Naeem and Dr. Vahora (a true and correct copy of which is attached hereto as

7   **Exhibit 37**).

8         139.    Naeem terminated Flores' employment at VDL, effective July 1, 2013.  *Id.*

9         140.    Flores forwarded Naeem's e-mail to Dr. Vahora, and reported to Dr. Vahora that

10  the problems at VDL were enormous: "I know that this took you by surprise . . . Dr. Vahora, I

11  have worked in laboratory [sic] since 1980 and never seen the problems Valley Diagnostics has."

12  *Id.* p. 2.

13        141.    Naeem, on behalf of VDL, violated the terms of Flores' employment contract

14  without Dr. Vahora's knowledge or consent.

15        142.    Naeem informed Dr. Vahora that he no longer wished to partner with Dr. Vahora

16  in the ownership or management of VDL.

17        143.    In an effort to rectify the damage done by Naeem to VDL's functionality and

18  profitability when he improperly terminated Flores, Dr. Vahora excoriated Naeem by e-mail

19  dated July 10, 2013, as follows:

20              [A]s a majority ow[n]er I do not agree with our ju[d]jment in this
21              case, he has work hard and beyond the call of duty he has
                performed. e.g
22                    1. He worked hard to get four additional important
                insurance provider, EHSAHS and other[s].
23                    2. [he] nego[t]iated with most of the lab sup[p]l[i]er for best
                quality and price for EMR, UDS, PSS, ATNT, and many more.
                      3. [he] trained phlebotomists and clients for our services
24                    4. [he] work[ed] as a clients [relationship] representative for
                technical and many other problems
25                    5. Along with me he took you around to doctors and nursing
                home [to teach you] how to sell lab businesses and how to
26              communicate with them
                      6. other than above listed many other services he has
27              provided that you Dr. Saeed an[d] all th[e] staff at vall[e]y labs [are
                aware of].

28

Ex. 37 p. 1.

144.    On July 12, 2013, Dr. Vahora sent a follow-up e-mail to Naeem, beseeching Naeem to "address [A]lfonsos problem" and reminding him that "by ignoring problem[s they] don't go aw[a]y they multiply."  Ex. 37 p. 1.

145.    Naeem ignored that plea, as well as Dr. Vahora's further e-mails of July 16, 18 and 21, 2013.  *See* Dr. Vahora's July 16-21, 2013 e-mails to Naeem (true and correct copies of which are attached hereto as **Exhibit 38**).

146.    In desperation, Dr. Vahora reached out to Defendant Najam in search of a way to reach Naeem, to wind down the partnership, and to address management and ownership of VDL, to no avail.

147.    Exasperated, on July 27, 2013, Dr. Vahora wrote Naeem a letter, copying Flores and Najam, in relevant portion as follows:

> I have return[ed] to you several e-mail[s] but you did not respond. I have talked to your Brother Dr. Najam, but as of today I have not received any proposal in writing for resolving any issue in partnership.
>
> If by the first of August 2013. If I did not receive any written document from you, then after our fasting month is over. I will come to Madera and legally take over the lab.
>
> I have done many favors for you and your family, this is pure intensions [o]n my part, but unfortunately you and your greediness cunningness, and dishonest ways.
>
> As far as I am concern[ed], Alfonso is employed by Valley Diagnostics Lab. He has one year contract. If we don't need his services which I doubt Valley Diagnostics Labs has to fulfill the term of the contract.  Meanwhile I have given him permission to go to all the clients and continue [the tasks] which he was doing before.
>
> **I have paid money 60% to purchase Valley Diagnostics Labs from Dr. Saeed.  For one year I have invested my money, time, effort and everything else to pay for rent, payroll, Supplies, reagents and even your salary by my Checks, Credit cards and Cash, so this lab can be self-sufficient and profitable.**
>
> **Valley Diagnostics had an average of 20 specimens per day, even after six months of your lousy effort. We have now EHS, Central Valley Alliance, La Salle and other insurances. As a result of Alfonso and my negotiated experience, planning and strategy we have all those insurances and now eighty to one**

**hundred specimens per day.**

> . . . After seeing this future you are trying to conspire against me and throw me out

> **. . . For the Fresno office, I said we will improve it and get more specimens. And we did. . . I had a confidence that, I will make this lab profitable. With help of Alfonso we did it in a year.**

> What did you do Naeem, just collect specimens from Fresno Office and spy on others?  I brought money, talent, knowledge, experience, ideas, vision and action in this partnership. Na[ee]m Bhai what did you [bring] to the table? only $40,000.00 in the beginning of which you took more than $60,000.00 already so your contribution is in this business is zero in money, knowledge, experience etc. . .

> I help you and your family with all my total honesty and sincerity 100%, so you can live comfortably and settle here.  But in response, you are trying to steal everything from me and you are trying to have everything and stab me the back.

> Now, I am not asking but, demanding from you or anybody at Valley Labs that without my permission you cannot hire or fire any key personnel or make any contracts or commitment for any reagents or equipment's etc. . . Any legal financial loss will be your responsibility. By the way, you might think but this is not your lab only for immigration purposes you have those papers? But for legal point of view, you have taken money you invested out of the bank. Don't put me in a situation where I have to take any legal action. I don't want hurt you or anybody but you cannot take advantage of Alfonso and me . . .

> Dr. G. Vahora

*See* July 27-29, 2013 correspondence (a true and correct copy of which is attached hereto as **Exhibit 39**) at pp. 2-3 (emphasis supplied).

148.    In a subsequent telephone conversation, Naeem agreed to submit a written proposal to Dr. Vahora to liquidate their partnership, but he never did so in spite of numerous follow-up requests from Dr. Vahora.  *See, e.g.*, Ex. 39 p. 1 ("we have talked [a] lot, now it is time to put ur [sic] proposals on papers . . .  So please instead of talk, lets [sic] put on paper your proposal.")

149.    Upon information and belief, Naeem consulted with his brother, Defendant Najam, as to his obligations and rights with respect to Dr. Vahora and VDL.

150.    On July 31, 2013, Naeem responded to Dr. Vahora via e-mail as follows: "[I] am

1  willing to pay you back a justifiable amount, in a mutually agreed manner, within a mutually

2  agreed time frame . . . Feel free to discuss the modus operandi as per your convenience." *See* July

3  31, 2013 e-mail correspondence between Naeem and Dr. Vahora (a true and correct copy of

4  which is attached hereto as **Exhibit 40**) at p. 2.

5     151.   Dr. Vahora responded that Naeem's proposal – that Naeem continue to own and

6  manage the lab himself, and that he repay Dr. Vahora a "justifiable amount" for his ownership

7  share and massive infusion of funds – was "iffy, vague" and evasive.  Ex. 40 p. 1.

8     152.   Although earlier in July 2013, Naeem had threatened to close VDL and declare

9  bankruptcy in order to rob Dr. Vahora of his $500,000+ investment in VDL, Dr. Vahora observed

10  that "Now you want to keep this business for your self only . . ." *Id.*

11     153.   Dr. Vahora noted that "I have more rights on this lab, as [I paid $380,000+ in

12  operating expenses] without getting any thing in return. I have spent money, time and effort to get

13  this lab at this l[e]vel. I hope you agree with it. I did all this only for Valley Lab and not for my

14  personal gain, up till now." *Id.*

15     154.   Dr. Vahora offered the following alternative proposals to dissolve the partnership

16  that purchased and ran VDL:

> if you give [me] all my money which I spent for this business,
> [compensation] for my effort and one year of potential growth and
> profit then I may agree to let you have whole business for your self.
> OTHER WISE ,
>
> I will have 60% Ownership of Valley Lab. Any profits of 1st year
> pay for my all money, as [for] more than one year I am supporting
> this lab and I am the only one [who] took a risk for all the time and
> money I spend for the growth of this lab.  Once I get paid up, we
> can decide fair market value of the business. You pay me 60% of it
> and then we can depart. This is just a starting point to resolve the
> issue.
>
> IF YOU AGREE ANY OF ABOVE, THEN I CAN COME TO
> MADERA AND I WILL HAVE LAWYER IN FRESNO WHO
> CAN SIT DOWN WITH YOUR LAWYER AND WORK OUT
> FAIR DEAL WHICH WILL BE AGREEABLE AND FAIR TO
> BOTH OF US.

27  *Id.* pp. 1-2.

28     155.   Naeem refused both of Dr. Vahora's offers.

156.    Five months later, in December 2013, Flores brought a lawsuit against Naeem and VDL in Madera County Superior Court, styled *Flores v. Valley Diagnostic Labs, Inc., et al.*, No. MCV064536, alleging wrongful termination (the "Flores Lawsuit").

157.    Upon information and belief, in the Flores Lawsuit, Flores alleged in part that Naeem acted on behalf of VDL when he terminated Flores' employment.

158.    As part of the Flores Lawsuit, Dr. Vahora submitted a certification (the "Vahora Certification," a true and correct copy of which is attached hereto as **Exhibit 41**) wherein Dr. Vahora describes the aforesaid events under oath.

159.    In the interim, upon information and belief, Dr. Saeed terminated his consultancy agreement with VDL.

160.    Naeem has denied the existence of his 40/60 partnership with Dr. Vahora in VDL.

161.    Naeem has denied Dr. Vahora the fruits of his investment of time, effort and money in VDL.

162.    Neither Naeem nor VDL have repaid any of the funding – in an amount in excess of $380,000 – that Dr. Vahora provided to VDL, or any interest thereupon.

163.    Neither Naeem nor VDL have repaid Dr. Vahora's $120,000 investment in 60 percent of the purchase of VDL, or any interest thereupon or profit distribution with respect thereto.

164.    Naeem has not compensated Dr. Vahora for his time and effort in investigating and modeling the value and profitability of VDL prior to its purchase.

165.    Naeem has not compensated Dr. Vahora for his time and effort in operating and managing VDL and in hiring staff to operate and manage VDL – including but not limited to VDL's human resources, finances, vendor contracts and customer relationships.

166.    Neither Naeem nor VDL have shared 60 percent of VDL's profits – or any portion of VDL's profits – with Dr. Vahora, nor has Dr. Vahora benefited in any way from VDL's losses, or any portion thereof

167.    Dr. Vahora has in all respects been deprived of his right, title and ownership interest in VDL or any profits and losses arising therefrom.

**COUNT I**
**Breach of Oral Contract**
**(Plaintiff v. Naeem Qarni)**

168.   Plaintiff incorporates the allegations of the preceding paragraphs as if more fully set forth at length herein.

169.   "The elements of a breach of oral contract claim are the same as those for a breach of written contract: a contract; its performance or excuse for nonperformance; breach; and damages." *Stockton Mortgage, Inc. v. Tope*, 233 Cal. App. 4th 437, 453, 183 Cal. Rptr. 3d 186 (Cal. App. 3d Dist. 2014) (citing *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal. App. 3d 1371, 1388, 272 Cal. Rptr. 387 (1990)).

170.   An essential element establishing the existence of any contract is the consent of the parties, or mutual assent.  Cal. Civ. Code §§ 1550(2) & 1565(2).

171.   "Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270-71, 27 P.3d 702, 709 (2001) (citing 1 Witkin, Summary of Cal. Law, Contracts § 128, p. 153 (9th ed. 1987)).

172.   "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (citing *City of Moorpark v. Moorpark Unified School Dist.*, 54 Cal. 3d 921, 930, 819 P.2d 854 (1991)).

173.   Naeem offered Dr. Vahora the opportunity to enter into a partnership for the purpose of purchasing and operating VDL.

174.   Dr. Vahora justifiably understood that Naeem was inviting Dr. Vahora's assent to Naeem's offer to form a partnership for the purpose of purchasing and operating VDL.

175.   Dr. Vahora accepted and assented to Naeem's offer to enter a partnership for the purpose of purchasing and operating VDL, thereby creating an enforceable agreement.

176.   The initial terms of that agreement were as follows: Dr. Vahora and Naeem would purchase VDL for $200,000; Dr. Vahora and Naeem would each contribute $100,000 to the purchase of VDL; Dr. Vahora and Naeem would be 50/50 partners in VDL; Naeem would apply

for legal immigrant status in the United States; Dr. Vahora would teach Naeem how to operate and manage VDL; Naeem would run the day-to-day operations of VDL and have the title of President of VDL.

177.    In practice, Dr. Vahora contributed $120,000 to the purchase of VDL and Naeem contributed only $80,000 to the purchase of VDL, making Dr. Vahora a 60% owner of VDL and Naeem a 40% owner of VDL.

178.    In addition, in practice, Dr. Vahora contributed more than $380,000 to VDL's operation, in the form of rent payments for VDL; payment of VDL's operating expenses; provision of supplies to VDL; and funding VDL's operating shortfalls.

179.    Dr. Vahora also spent an inordinate amount of time and effort on the management and operation of VDL's human resources, finances, vendor contracts and customer relationships.

180.    Dr. Vahora performed his obligations under the enforceable agreement he made with Naeem.

181.    Naeem also breached the agreement with Dr. Vahora by failing to effectively run the day-to-day operations of VDL and by refusing to recognize or honor Dr. Vahora's 60% ownership interest in VDL.

182.    As a result of Naeem's breach, Dr. Vahora has been damaged in an amount exceeding $500,000, with the specific amount of damages to be determined at the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor and against Defendant Naeem Qarni for breach of oral contract, together with compensatory damages and such other relief as this Court deems just and proper.

### COUNT II
### Breach of the Implied Duty of Good Faith and Fair Dealing
### (Plaintiff v. Naeem Qarni)

183.    Plaintiff incorporates the allegations of the preceding paragraphs as if more fully set forth at length herein.

184.    In *Olyaie v. Gen. Elec. Capital Bus. Asset Funding Corp.*, 217 F. App'x 606 (9th Cir. 2007), the United States Court of Appeals for the Ninth Circuit explained:

The covenant of good faith and fair dealing is "implied by law in

every contract," *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 100 Cal. Rptr. 2d 352, 8 P.3d 1089, 1110 (2000), including "the contractual relationship between a borrower and lender." *Wagner v. Benson*, 101 Cal. App. 3d 27, 33, 161 Cal. Rptr. 516 (1980). The covenant obligates the parties to a contract not to "do anything which injures the right of the other to receive the benefits of the agreement." *Id.*

185.    The *Olyaie* Court went on to quote *R.J. Kuhl Corp. v. Sullivan*, 13 Cal. App. 4th 1589, 1602, 17 Cal. Rptr. 2d 425 (1993) (quoting Restatement (Second) of Contracts § 205, cmt. d (1981)):

Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

186.    The *Olyaie* Court further referenced *Carma Developers (Cal.), Inc., v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 6 Cal. Rptr. 2d 467, 826 P.2d 710, 726-27 (1992) (internal citations and quotation marks omitted), which held that:

The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. However, defining what is required by this covenant has not always proven an easy task. . . notwithstanding the difficulty in devising a rule of all-encompassing generality, a few principles have emerged in the decisions. To begin with, breach of a specific provision of the contract is not a necessary prerequisite. . . . Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive.

187.    In this case, Defendant Naeem Qarni's breach of the duty of good faith and fair dealing is based upon his dishonesty and subterfuge with regard to his intentional and/or negligent failure to run VDL in comportment with the original agreement between the parties, his impermissible firing of Flores, and his refusal to recognize Dr. Vahora's 60% ownership interest and managerial role in VDL.

188.    Implicit in the oral agreement is the duty inherent upon both parties to refrain from

doing anything which denies the other party the fruits of that contract.

189.     Naeem breached that duty by mismanaging VDL, firing Flores and denying Dr. Vahora's ownership interest in VDL, among other bad acts.

190.     As a direct and proximate result of Naeem's breach of the duty of good faith and fair dealing, Dr. Vahora has been damaged in an amount exceeding $500,000, with the specific amount of damages to be determined at the time of trial.

191.     Naeem's breach of the implied covenant of good faith and fair dealing was knowing and intentional, and willful and wanton, and part of an intentional scheme to deprive Dr. Vahora of his contractual rights in VDL.  As a result, Dr. Vahora is entitled to punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor and against Defendant Naeem Qarni for breach of the implied duty of good faith and fair dealing, together with compensatory damages, punitive damages and such other relief as this Court deems just and proper.

### COUNT III
### Unjust Enrichment
### (Plaintiff v. Naeem Qarni and Valley Diagnostics Laboratory Inc.)

192.     Plaintiff incorporates the allegations of the preceding paragraphs as if more fully set forth at length herein.

193.     The elements of unjust enrichment under California law are (1) the receipt of a benefit; (2) the unjust retention of the benefit; (3) at the expense of another.  *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1593, 80 Cal. Rptr. 3d 316 (Cal. Ct. App. 2008).

194.     In this case, Naeem received the benefit of (a) the ability to purchase ownership of VDL with Dr. Vahora's $120,000 investment; (b) the position of President of VDL; (c) the added value of Dr. Vahora's expertise in managing and operating a medical laboratory facility; (d) Dr. Vahora's infusion of more than $380,000 in the form of rent payments for VDL, payment of VDL's operating expenses, provision of supplies to VDL, and funding VDL's operating shortfalls; and (e) the value of Dr. Vahora's time and effort on the management and operation of VDL's human resources, finances, vendor contracts and customer relationships.

195.     Naeem unjustly retained these benefits at Dr. Vahora's expense, because Naeem did not compensate Dr. Vahora for his time, effort, expertise, or services rendered to VDL; Naeem refuses to acknowledge Dr. Vahora's 60% ownership interest in VDL; Naeem refuses to share VDL's profits and/or losses with Dr. Vahora; Naeem has not refunded Dr. Vahora's investment in VDL with interest thereupon; and Naeem has not refunded Dr. Vahora's investment of more that $380,000 in the form of rent payments for VDL, payment of VDL's operating expenses, provision of supplies to VDL, and funding VDL's operating shortfalls, with interest thereupon.

196.     In addition, VDL received the benefit of (a) the value of Dr. Vahora's expertise in managing and operating a medical laboratory facility; (b) Dr. Vahora's infusion of more than $380,000 in the form of rent payments for VDL, payment of VDL's operating expenses, provision of supplies to VDL, and funding VDL's operating shortfalls; and (c) the value of Dr. Vahora's time and effort with respect to the management and operation of VDL's human resources, finances, vendor contracts and customer relationships.

197.     VDL unjustly retained these benefits at Dr. Vahora's expense, because VDL did not compensate Dr. Vahora for his time, effort, expertise, or services rendered to VDL; VDL has not shared its profits with Dr. Vahora in accordance with Dr. Vahora's ownership interest in VDL; VDL has not refunded Dr. Vahora's investment in VDL with interest thereupon; and VDL has not refunded Dr. Vahora's investment of more that $380,000 in the form of rent payments for VDL, payment of VDL's operating expenses, provision of supplies to VDL, and funding VDL's operating shortfalls, with interest thereupon.

198.     Defendants' breach of the implied covenant of good faith and fair dealing was knowing and intentional, and willful and wanton, and part of an intentional scheme to deprive Dr. Vahora of his investment and related rights in VDL.  As a result, Dr. Vahora is entitled to punitive damages.

199.     As a direct and proximate result of the Defendants' unjust enrichment, Dr. Vahora has been damaged in an amount exceeding $500,000, with the specific amount of damages to be determined at the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor and against Defendants for unjust enrichment, together with compensatory damages, punitive damages and such other relief as this Court deems just and proper.

## COUNT IV
### Promissory Estoppel
### (Plaintiff v. Naeem Qarni)

200.   Plaintiff incorporates the allegations of the preceding paragraphs as if more fully set forth at length herein.

201.   Under the promissory estoppel doctrine, "a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1137-38 (E.D. Cal. 2013) (quoting *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249, 449 P.2d 462 (1969)).

202.   The elements of promissory estoppel are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Khan*, 975 F. Supp. 2d at 1138 (citing *Laks v. Coast Fed. Sav. & Loan Assn.*, 60 Cal. App. 3d 885, 891, 131 Cal. Rptr. 836 (1976); *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692, 21 Cal. Rptr. 3d 732 (2004)).

203.   In *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transp. Authority*, 23 Cal. 4th 305, 310, 71 P.3d 63, 66 (2000), the Supreme Court of California summarized the theory of promissory estoppel as applied by California courts as follows:

> In California, under the doctrine of promissory estoppel, "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Restatement 2d Contracts, § 90 subd. 1; *see C & K Engineering Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 6, 587 P.2d 1136 (1978) (Section 90 "has been judicially adopted in California").

204.   In all promissory estoppel claims, "[t]he vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject

1  such person to loss or injury by disappointing the expectations upon which he acted." *Garcia v.*

2  *World Sav., FSB*, 183 Cal. App. 4th 1031, 1041, 107 Cal. Rptr. 3d 683 (2010).

3      205.  Naeem clearly and unambiguously promised to partner with Dr. Vahora in the

4  purchase and operation of VDL.

5      206.  Dr. Vahora relied upon the promise made by Naeem.

6      207.  As evidence of Dr. Vahora's reliance on Naeem's promise, Dr. Vahora invested

7  $120,000 in the purchase of VDL, oversaw the large-scale operation of VDL, infused more than

8  $380,000 into VDL's day-to-day activities, and managed VDL's human resources, finances,

9  vendor contracts and customer relationships.

10      208.  Dr. Vahora's reliance upon Naeem's promise to partner with Dr. Vahora in the

11  purchase and operation of VDL was reasonable insofar as Dr. Vahora had experience in the

12  ownership and management of medical diagnostic, pathology and laboratory concerns, and

13  Naeem did not have sufficient funds or any necessary experience to purchase and manage VDL

14  himself.

15      209.  Dr. Vahora's reliance upon Naeem's promise to partner with Dr. Vahora in the

16  purchase and operation of VDL was foreseeable insofar as Naeem's offer constituted an invitation

17  to make an oral contract and sought Dr. Vahora's assent to a specific partnership with a

18  predetermined goal.

19      210.  Regardless of the validity of the parties' oral agreement (later documented in

20  writing) as a binding contract, Naeem's offer created a reasonable and foreseeable expectation

21  that Dr. Vahora would rely thereupon and invest in the purchase and operation of VDL.

22      211.  As a direct and proximate result of Naeem's unjust enrichment, Dr. Vahora has

23  been damaged in an amount exceeding $500,000, with the specific amount of damages to be

24  determined at the time of trial.

25      212.  Injustice can only be avoided by enforcement of the promise made by Naeem,

26  because his offer should reasonably have been expected to induce Dr. Vahora's reliance

27  thereupon.

28      WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor

1  and against Naeem Qarni for promissory estoppel, thus enforcing the oral agreement made with

2  Dr. Vahora, together with compensatory damages and such other relief as this Court deems just

3  and proper.

### COUNT V
### Violation of California's Unfair Competition Law
### (Plaintiff v. Defendants)

6  213.    Plaintiff incorporates the allegations of the preceding paragraphs as if more fully

7  set forth at length herein.

8  214.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or

9  fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

10  215.    "Each of these three adjectives [unlawful, unfair or fraudulent] captures a separate

11  and distinct theory of liability."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010)

12  (internal quotations omitted).

13  216.    The UCL's coverage is broad, sweeping and embracing of anything that can be

14  properly called a business practice and at the same time forbidden by law.  *Cel–Tech Comms.,*

15  *Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 973 P.2d 527 (1999).  "It governs

16  anti-competitive business practices as well as injuries to consumers, and has a major purpose the

17  preservation of fair business competition."  *Id*. (internal citations and quotations omitted).

18  217.    The typical measure of damages under the UCL is the return of funds wrongly

19  received.

20  218.    In this case, Naeem engaged in unfair and/or fraudulent business acts in violation

21  of the UCL by:

22  •    Forming a contract with Dr. Vahora to form a partnership for the purchase

23       and operation of VDL, never intending to honor the terms of the contract;

24  •    Refusing to fund 50% of the purchase of VDL as originally planned, and

25       instead funding only 40% of VDL's purchase price;

26  •    Mismanaging VDL's finances, human resources, supplier contracts and

27       customer relations;

28  •    Diluting the interests in VDL without formally seeking Dr. Vahora's

approval and/or without disclosing such dilution to Dr. Vahora;

- Firing Flores without cause or authority to do so;
- Refusing to repay Dr. Vahora's funding (in excess of $380,000) of VDL's operating expenses, with interest;
- Refusing to acknowledge Dr. Vahora's 60% ownership interest in VDL;
- Refusing to cause VDL to share its profits with Dr. Vahora; and
- Refusing to recognize or repay Dr. Vahora's $120,000 investment in the purchase of VDL.

219.   In addition, VDL engaged in unfair and/or fraudulent business acts in violation of the UCL by:

- Refusing to repay Dr. Vahora's funding (in excess of $380,000) of VDL's operating expenses, with interest;
- Refusing to acknowledge Dr. Vahora's 60% ownership interest in VDL;
- Refusing to share its profits and/or losses with Dr. Vahora; and
- Refusing to refund Dr. Vahora's $120,000 investment in the purchase of VDL, with interest.

220.   Furthermore, Najam engaged in unfair and/or fraudulent business acts in violation of the UCL by:

- repeatedly encouraging Dr. Vahora to engage in a business partnership with Naeem which Najam knew would not benefit Dr. Vahora;
- knowingly misrepresenting to Dr. Vahora the capacity of Naeem to run the day-to-day operations of VDL; and
- falsely representing to Dr. Vahora on behalf of Naeem that Naeem was willing and able to repay Dr. Vahora for his ownership interest and additional capital infusion in VDL.

221.   Finally, Dr. Masood engaged in unfair and/or fraudulent business acts in violation of the UCL by:

- repeatedly encouraging Dr. Vahora to engage in a business partnership

1    with Naeem which Najam knew would not benefit Dr. Vahora;

2         •    knowingly misrepresenting to Dr. Vahora the capacity of Naeem to run the

3              day-to-day operations of VDL; and

4         •    taking an ownership interest in VDL from Naeem without Dr. Vahora's

5              knowledge or consent.

6    222.    Pursuant to California's UCL, Plaintiff seeks the return of the more than $500,000

7    he invested in VDL, plus interest, as well as payment for his services with respect to the pre-

8    purchase analysis and the post-purchase operation and management of VDL, plus costs and

9    interest.

10   WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor

11   and against Defendants for damages in violation of California's Unfair Competition Law, and

12   order compensatory damages and such other relief as this Court deems just and proper.

13                                   **COUNT VI**
                          **Civil Conspiracy to Commit Fraudulent Deceit**
14               **(Plaintiff vs. Naeem Qarni, Najam Qarni and Sheikh Masood)**

15   223.    Plaintiff incorporates the allegations of the preceding paragraphs as if more fully

16   set forth at length herein.

17   224.    "The elements of an action for civil conspiracy are the formation and operation of

18   the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the

19   common design. . . . In such an action the major significance of the conspiracy lies in the fact that

20   it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages

21   ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the

22   degree of his activity." *Mox Incorporated v. Woods*, 202 Cal. 675, 677-678, 262 P. 30 (1927);

23   *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 869 P.2d 454, 28 Cal. Rptr.

24   2d 475 (1994).

25   225.    Under Cal. Civ. Code § 1709, "One who willfully deceives another with intent to

26   induce him to alter his position to his injury or risk, is liable for any damage which he thereby

27   suffers."

28   226.    Deceit is defined as any of the following:

1)      The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2)      The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

3)      The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

4)      A promise, made without any intention of performing it.

Cal. Civ. Code § 1710.

227.    At common law, fraud is defined as the "misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 3, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

228.    Naeem, Najam and Dr. Masood conspired to fraudulently deceive Dr. Vahora about the investment in VDL.

229.    Naeem falsely represented and/or suppressed that he was capable of managing a medical testing facility on a day-to-day basis; that he was willing to pay $100,000 toward a 50/50 ownership in VDL; that he would fund half of the purchase price of VDL; that his salary was unilaterally adjusted from $3,000 to $5,000; that he diluted and sold a portion of his interest in VDL; that he intended to honor the contract with Dr. Vahora; that he was competently and honestly managing VDL's finances, human resources, supplier contracts and customer relations; that he had the authority to unilaterally fire Flores; that he was legally entitled and empowered to provide himself a loan from Dr. Vahora which VDL was obligated to repay; that he was not obligated to repay Dr. Vahora's funding (in excess of $380,000) of VDL's operating expenses, with interest; that Dr. Vahora was not entitled to a 60 percent ownership interest in VDL; that Dr. Vahora was not entitled to share in VDL's ultimate profits; and that Dr. Vahora was not entitled to recompense of his $120,000 original ownership investment in VDL, with interest.

230.    Najam falsely represented and/or suppressed facts about Naeem's capabilities, wealth, and intentions with respect to Dr. Vahora and VDL.  For example, Naeem misrepresented the following:

•       that Naeem could afford to pay $100,000 toward a 50/50 partnership in VDL;

- that Naeem was capable of running the day-to-day operations of a medical testing facility;
- that a partnership with Naeem was a good investment risk; and
- that Naeem intended to compensate Dr. Vahora for the money he spent purchasing and funding VDL.

231.   Dr. Masood falsely represented and/or suppressed facts about Naeem's capabilities, wealth, and intentions with respect to Dr. Vahora and VDL.  For example, Naeem misrepresented the following:

- that Naeem could afford to pay $100,000 toward a 50/50 partnership in VDL;
- that the terms of the partnership between Naeem and Dr. Vahora, as documented by the April 27, 2012 e-mail, which terms Dr. Masood negotiated on behalf of Naeem, were reasonable, realistic, and capable of performance by Naeem;
- that Naeem was capable of running the day-to-day operations of a medical testing facility; and
- that a partnership with Naeem was a good investment risk.

232.   Upon information and belief, Naeem, Najam and Dr. Masood worked in concert to identify, recruit and entice Dr. Vahora into the investment partnership with Naeem in VDL in order to facilitate Naeem's immigration to the United States of America.

233.   As part of their conspiracy, Naeem, Najam and Dr. Masood engaged in numerous acts of fraudulent deceit directed at Dr. Vahora, as described hereinabove.

234.   As a direct and proximate result of this common scheme of fraudulent deceit, Dr. Vahora has been damaged in an amount exceeding $500,000, with the specific amount of damages to be determined at the time of trial.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor and against Defendants Naeem, Najam and Dr. Masood for damages for conspiratorial violation of Cal. Civ. Code § 1709, and order compensatory damages and such other relief as this Court

1  deems just and proper.

2  **COUNT VII**
**Intentional Misrepresentation**

3  **(Plaintiff vs. Naeem Qarni, Najam Qarni and Sheikh Masood)**

4  235.  Plaintiff incorporates the allegations of the preceding paragraphs as if more fully

5  set forth at length herein.

6  236.  The elements of a claim for intentional misrepresentation are: "(1) a

7  misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity

8  (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting

9  damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 22 Cal. Rptr. 3d 352, 102

10  P.3d 268, 274 (Cal. 2004) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638, 49 Cal. Rptr. 2d

11  377, 909 P.2d 981 (1996)); *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141 (S.D.

12  Cal. 2014)

13  237.  In this case, Naeem, Najam and Dr. Masood knowingly misrepresented to

14  Dr. Vahora that Naeem was capable of running the day-to-day operations of a medical testing

15  facility; that Naeem would contribute $100,000 toward the purchase of VDL; and that a

16  partnership in VDL with Naeem was a good investment.

17  238.  Naeem, Najam and Dr. Masood made these knowing misrepresentations to

18  Dr. Vahora intending him to rely thereupon.

19  239.  Upon information and belief, Naeem, Najam and Dr. Masood wanted Dr. Vahora

20  to rely upon their misrepresentations and false assurances because they believed that Dr. Vahora's

21  medical expertise and financial resources would benefit Naeem in his efforts to run a medical

22  business in the United States, which business was required in order to complete Naeem's

23  application for an E-2 Treaty Investor visa.

24  240.  Dr. Vahora, who was acquainted with medical testing facilities and the operation

25  of medical businesses, had no personal knowledge of Naeem, including whether he was smart,

26  capable, honest or solvent.  Therefore, Dr. Vahora justifiably relied upon these knowing

27  misrepresentations and false assurances.

28  241.  As a direct and proximate result of this intentional misrepresentation, Dr. Vahora

1  has been damaged in an amount exceeding $500,000, with the specific amount of damages to be

2  determined at the time of trial.

3   WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor

4  and against Defendants Naeem, Najam and Dr. Masood for damages for intentional

5  misrepresentation, and order compensatory damages and such other relief as this Court deems just

6  and proper.

7
         **COUNT VIII**
         **Conversion**
8
       **(Plaintiff vs. Naeem Qarni)**

9   242. Plaintiff incorporates the allegations of the preceding paragraphs as if more fully

10  set forth at length herein.

11   243. Pursuant to Cal. Civ. Code § 1712: "One who obtains a thing without the consent

12  of its owner, or by a consent afterwards rescinded, or by an unlawful exaction which the owner

13  could not at the time prudently refuse, must restore it to the person from whom it was thus

14  obtained, unless he has acquired a title thereto superior to that of such other person, or unless the

15  transaction was corrupt and unlawful on both sides."

16   244. Naeem has obtained operational control over and all profits from VDL without

17  consent of its majority owner, Dr. Vahora.

18   245. Naeem refuses to treat Dr. Vahora as majority owner of VDL.

19   246. Naeem refuses to compensate Dr. Vahora for the value of his 60 percent

20  ownership interest in VDL.

21   247. Naeem refuses to compensate Dr. Vahora for the $120,000 he spent obtaining a 60

22  percent ownership interest in VDL, plus interest.

23   248. Naeem refuses to share any of VDL's profits with Dr. Vahora.

24   249. Naeem has also obtained over $380,000 in operational expenses for VDL from

25  Dr. Vahora, which infusion of funds allowed VDL to operate.

26   250. Naeem refuses to recompense Dr. Vahora for the $380,000 he infused into VDL.

27   251. Naeem does not have a title in VDL that is superior to Dr. Vahora's title in VDL.

28   252. The partnership agreement by and between Naeem and Dr. Vahora was neither

1   corrupt nor unlawful.

2        253.    Dr. Vahora has been damaged by Naeem's unlawful exaction of his majority

3   interest in VDL, including his rights to exert control over VDL, to enjoy VDL's profits and to

4   obtain recompense for the funds he infused into VDL.

5        WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor

6   and against Defendant Naeem for damages for conversion, and order compensatory damages and

7   such other relief as this Court deems just and proper.

8                                    **COUNT IX**
                            **Declaratory Judgment**
9          **(Plaintiff vs. Naeem Qarni and Valley Diagnostic Laboratory)**

10       254.    Plaintiff incorporates the allegations of the preceding paragraphs as if more fully

11   set forth at length herein.

12       255.    The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, in a case of actual

13   controversy within its jurisdiction any court of the United States, upon the filing of an appropriate

14   pleading, may declare the rights and other legal relations of any interested party seeking such

15   declaration, whether or not further relief is or could be sought.  28 U.S.C.S. § 2201(a).

16       256.    Declaratory relief may be granted where there is a substantial controversy,

17   between parties having adverse legal interests, of sufficient immediacy and reality to warrant the

18   issuance of a declaratory judgment.  *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004

19   JAK (AGRx), 2015 U.S. Dist. LEXIS 97262, at *99 (C.D. Cal. July 14, 2015).

20       257.    A declaratory judgment, like other forms of equitable relief, should be granted as a

21   matter of judicial discretion, exercised in the public interest.  *Id.*

22       258.    In determining whether to exercise declaratory jurisdiction, federal courts should

23   consider whether a declaratory judgment will serve a useful purpose in clarifying and settling the

24   legal relations between the parties, and whether it will terminate the controversy.  *Id.*

25       259.    In this case, Plaintiff seeks a declaration of his rights in and with respect to VDL.

26       260.    Specifically, Plaintiff seeks a declaration that he is 60% owner of and shareholder

27   in VDL, with 60% of VDL's outstanding voting rights and entitlement to 60% of VDL's profits.

28       261.    In addition, Plaintiff seeks a declaration that VDL owes him an amount in excess

of $380,000 as repayment for his funding of VDL's capital shortfalls and provision of supplies, as well as an amount to be determined at trial for his time and effort spent researching, modeling, managing, administering and running VDL.

262.    Plaintiff and Defendants have adverse legal interests with respect to ownership and control of VDL and repayment of monies spent by Dr. Vahora to benefit VDL.

263.    The adversity between Plaintiff and Defendants is immediate and real, rendering issuance of a declaratory judgment appropriate.

264.    The public interest will benefit from a clear legal declaration of the parties' rights and interests in and to VDL, as such a declaration will aid the function of VDL, which provides needed pathology and other laboratory services to the public at large.

WHEREFORE, Plaintiff respectfully requests that this Court issue a judgment determining that Dr. Vahora owns 60% of VDL, that Dr. Vahora is entitled to 60% control over VDL and a 60% share of VDL's profits and/or losses since 2012, and that Dr. Vahora is owed in excess of $380,000 from VDL as repayment for his funding of VDL's capital shortfalls and provision of supplies, as well as an amount to be determined at trial for his time and effort spent researching, modeling, managing, administering and running VDL.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury on all issues so triable.

Dated:  October 26, 2016

HOPKINS & CARLEY
A Law Corporation


By: /s/ Monique D. Jewett-Brewster
Maria S. Bellafronto
Monique D. Jewett-Brewster
Attorneys for Plaintiff
GULAMNABI VAHORA, M.D., Ph.D.

1

**EXHIBITS**

2    Exhibit 1      California Entity Detail

3    Exhibit 2      3/29/12 Email between Masood and Vahora attaching VDL financials; VDL info:
               equipment list, capabilities, accepted insurance
4
     Exhibit 3      April 17, 2012 Email from Naeem to Vahora
5
     Exhibit 4      June 27, 2012 unexecuted agreement of sale for VDL
6
     Exhibit 5      September 4, 2012 e-mail from Naeem
7
     Exhibit 6      September 19, 2012 e-mail from Naeem
8
     Exhibit 7      September 7, 2012 Vahora draft VDL evaluation
9
     Exhibit 8      September 10, 2012 edited VDL evaluation
10
     Exhibit 9      USICS decision
11
     Exhibit 10     Naeem's October 30, 2012 e-mail
12
     Exhibit 11     December 6, 2012 e-mail and attached flyers
13
     Exhibit 12     December 18, 2012 e-mail and attached lease
14
     Exhibit 13     Flores' December 20, 2012 e-mail and attached chart
15
     Exhibit 14     January 11, 2013 correspondence and attached contract by and between VDL and
16               CompuGroup regarding sale by LabDAQ of Siemens Advia 1650 and Centaur CP
               instrument interfaces
17
     Exhibit 15     Naeem January 12, 2013 e-mail to Dr. Vahora
18
     Exhibit 16     January 15-18, 2013 correspondence between Dr. Vahora and Diamond
19               Diagnostics Inc.

20   Exhibit 17     January 13-29, 2013 correspondence between Dr. Vahora and CompuGroup

21   Exhibit 18     February 11, 2013 e-mail correspondence between Dr. Vahora and Siemens'
               account manager
22
     Exhibit 19     December 14, 2012- February 8, 2013 e-mails between Flores and Rehab Centre
23               of Fresno

24   Exhibit 20     April 10, 2013 e-mail from Flores transmitting attached templates

25   Exhibit 21     April 21, 2013 e-mail between Flores and Thermo Fisher Scientific Specialty
               Diagnostic Group
26
     Exhibit 22     April 23, 2013 e-mails and attached product offering between Dr. Vahora and
27               Diazyme Laboratories

28   Exhibit 23     July 8, 2013 e-mail from Imunalysis Corporation to Dr. Vahora

| | |
|---|---|
| Exhibit 24 | April 22-26, 2013 e-mail correspondence between Flores and Software Inventors Ltd |
| Exhibit 25 | December 12, 2012 e-mail from Naeem to Dr. Vahora |
| Exhibit 26 | December 14, 2012 e-mail from Naeem to Dr. Vahora |
| Exhibit 27 | January 22, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 28 | January 27, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 29 | January 30, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 30 | February 6, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 31 | March 7-29, 2013 e-mails from Naeem to Dr. Vahora |
| Exhibit 32 | April 28, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 33 | May 1, 2013 e-mail from Naeem to Dr. Vahora |
| Exhibit 34 | June 29, 2013 Naeem e-mail to Dr. Vahora |
| Exhibit 35 | June 30, 2013 Dr. Saeed e-mail to Dr. Vahora |
| Exhibit 36 | June 21, 2013-July 2, 2013 correspondence between Dr. Vahora amd Kambiz Yaraei |
| Exhibit 37 | July 8-12, 2013 e-mail correspondence among Flores, Naeem and Dr. Vahora |
| Exhibit 38 | Dr. Vahora's July 16-21, 2013 e-mails to Naeem |
| Exhibit 39 | July 27-29, 2013 correspondence |
| Exhibit 40 | July 31, 2013 e-mail correspondence between Naeem and Dr. Vahora |
| Exhibit 41 | Vahora certification |